## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

WANDA KEFAUVER,                    :

             Plaintiff        :        **CIVIL ACTION NO. 3:04-1187**

     **v.**                            :        **(KOSIK, D.J.)**
                                     **(MANNION, M.J.)**

**JO ANNE B. BARNHART,**           :
**Commissioner of Social**
**Security Administration,**        :

          **Defendant**       :

## <u>REPORT AND RECOMMENDATION</u>

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision to deny the plaintiff's claim for Social Security Disability Insurance Benefits, ("DIB"), and Supplemental Security Income, ("SSI"), under Titles II and XVI of the Social Security Act, ("Act").  42 U.S.C. §§ 401-433, 1381-1383f.

Based upon a review of the record, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security  (Doc. No. 1) be denied.

1

## I. **Procedural Background**

The procedural background in this matter is complex.  On August 31, 1995, the plaintiff filed an application for a period of disability and disability insurance benefits which alleged that she had been totally disabled since December 31, 1988, due to fibromyalgia, bilateral shoulder impingement syndrome with significant loss of fine dexterity, and psychological overlay. The application was denied initially and upon reconsideration.

The first hearing in this matter took place on May 20, 1997.  In addition to the plaintiff's testimony, the ALJ heard the testimony of the plaintiff's husband, and also that of Dr. James Ryan, a vocational expert. (TR. 293-304). The ALJ concluded that although the plaintiff had impairments which could cause some of the symptoms of which she complained, they did not, in combination, meet any Listing in Appendix 1, Subpart P, Regulations No. 4, and were not so severe as to prevent her from performing a range of modified light level work. These conclusions were based primarily upon certain credibility determinations made by the ALJ, and his findings that, among other things, the medical documentation demonstrated that the plaintiff had not had any significant medical treatment which would comport with her stated level of severe physical and mental limitations.  As a result, the ALJ determined

2

that the plaintiff was not disabled for any time during the period December 31, 1988, through the date of the decision, July 23, 1997.

On September 5, 1997, the plaintiff filed a request for review of the ALJ's decision with the Appeals Council.  Approximately one month before, the plaintiff had protectively filed a second application for disability benefits on August 1, 1997, which alleged a later onset date of December 31, 1993. Hearing tapes of the May 20, 1997, hearing were not received by the plaintiff until July 1998.  The plaintiff filed a written argument with the Appeals Council on July 13, 1998.

On February 12, 1999, the Appeals Council remanded the matter to the ALJ for further evaluation and consideration of the plaintiff's mental impairment and how they might affect her residual functional capacity.  The ALJ was directed to obtain a psychological evaluation if warranted, and to hold another hearing for the purposes of obtaining additional vocational testimony. (TR. 330-332).

The two applications were consolidated and a new hearing was held on December 19, 1999.  On March 29, 2000, the ALJ once again determined that the medical record did not establish that the plaintiff had a disability as defined in the Act at any time relevant.  The ALJ again noted that the stated level of

severe mental and physical limitations was not consistent with the medical record as a whole.  Although the ALJ found that the plaintiff did suffer severe depression and other physical impairments, he concluded that the combined impairments were not so severe as to preclude her from performing substantial gainful activity in the nature of simple routine work in which she would not have to lift, carry, push, or pull, more than 10 pounds at any time. Such work included employment as cashier and attendant services such as a security information/gate guard. (TR. 344-355).

A request for review was filed with the Appeals Council on May 9, 2000. Hearing tapes were received by the plaintiff on October 5, 2001.  The plaintiff then filed a written argument with the Appeals Council on October 25, 2001. On February 26, 2002, the Appeals Council once again remanded.  Although the Appeals Council found that there was no evidence of bias on the part of the ALJ, it directed that a new ALJ be assigned to the matter, and that the reassigned ALJ further evaluate, among other things, the plaintiff's subjective complaints, mental impairments and residual functional capacity. (TR. 396-398).

The matter was reassigned and a third hearing was held on July 16, 2002, at which time the plaintiff, her husband, and Mr. Ryan testified again,

in addition to Richard W. Cohen, M.D., a medical consultant. (TR. 31-85).  The ALJ agreed with the prior determinations and concluded that the plaintiff  was not entirely credible concerning the intensity, duration and limiting effects of her symptoms, and that her testimony in this regard was inconsistent with the medical records as a whole.  The ALJ found that the plaintiff retained the functional capacity to perform a limited range of light level work. As a result, the ALJ determined that the plaintiff was not disabled for any relevant period. (TR. 20-28).

The plaintiff filed a request for review of the decision with the Appeals Council on December 3, 2002, which was denied on April 16, 2004. Thus, the ALJ's decision stood as the final decision of the Commissioner.

Presently pending before the court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on June 2, 2004. (Doc. No. 1). After being granted an extension of time in which to do so the Commissioner filed a response on August 9, 2004. (Doc. No. 6).

## II.  Disability Determination Process

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must

sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 C.F.R. §§ 404. 1520, 416.920.

The instant action was ultimately decided at the fifth step of the process, when the ALJ determined that the plaintiff's combined impairments did not prevent her from performing modified light level employment. At issue is whether substantial evidence supports the ALJ's determination.

## III.  Evidence of Record

The plaintiff was born on June 11, 1954, and was 34 years old as of the alleged onset date of disability, August 31, 1988.  She was 43 years old as of December 31, 1997, the onset date alleged in the second application, and 48 years old at the time of the final decision in this matter. (TR. 49).   The plaintiff has a high school education and completed nine months of a three year nursing program. She is also certified as a first class welder.  Her previous relevant work included employment as a welder, accounts receivable clerk,

6

bank teller, machine operator and assembler, among other employment. (TR. 53-54).

The plaintiff's medical problems escalated in 1987, when she was involved in a car accident and sustained injuries to her back, neck, shoulders and arms. (TR. 406).  She has diagnoses of fibromyalgia, bilateral shoulder pain, low back pain, anxiety, and major depression. (TR. 346). Her primary care physician is Douglas Geiselman, M.D. (TR. 215-245). She has also been evaluated and/or treated by, among other health professionals, Paul A. Anderson, D.Ed., a psychologist; Allen Greenstein, Ph.D., a psychologist; Sanjiv Naidu, M.D., an arthritis specialist; Daniel E. Gelb, M.D., an orthopaedic specialist; Richard W. Cohen, M.D., a psychiatrist;  Meg Figmore, M.D., a womens' health care specialist; Michael A. Catino, M.D., a scoliosis and spine specialist, and Rick Topper, a physical therapist.

On June 28, 1991, the plaintiff was evaluated by Dr. Paul A. Anderson, a psychologist, apparently in conjunction with a personal injury claim.  In a report of the same date to the plaintiff's personal injury attorney, Dr. Anderson stated that he had reviewed a Physical Capacities Evaluation performed by Earl J. Wenner, D.O., and that information, along with his prior findings, suggested that the plaintiff's exertional range "had been increased to include

a modified light exertional level." (TR. 158). He stated that the plaintiff could probably perform work as an usher, receptionist or sales clerk. (TR. 159).

Dr. Geiselman is the plaintiff's primary care physician. His records indicate that the plaintiff treated with him approximately every other month, and complained over the years of diffuse symptoms, which included pain in the neck, shoulders, arms, legs, fingers, hip, and back. She complained of problems with concentration, fatigue, and of ear and headaches. Initially, Dr. Geiselman referred her for various diagnostic tests, most of which produced normal results, and could not explain the plaintiff's diffuse symptoms. He also referred her for physical therapy, and prescribed anti-inflammatory and pain medications.

Dr. Geiselman noted on October 12, 1995, that the plaintiff's reflexes, station and gait were normal, and that no atrophy was present. (TR. 225). He completed a Functional Impairment Questionnaire on December 3, 1996, which indicated that he believed that the plaintiff could occasionally lift 10 to 20 pounds, but never lift more than that; could stand or walk 2 to 4 hours in an 8-hour day, and could sit for 6 or more hours in an 8-hour day. (TR. 215-216).

Dr. Geiselman referred the plaintiff to Dr. Naidu who examined her on November 26, 1996.  Dr. Naidu's Impression was:

> 1.    Vague left upper extremity pain which is getting better at this point. This may be a tendinitis of the extensor wad on the left side.
>
> 2.    Mild right subacromial impingement.
>
> Plan: She is getting better with regards to this vague left upper extremity pain.  She does not have any focal findings.  I will only see her on an as needed basis hereafter...

(TR. 273-273).

On May 16, 1997, in correspondence to the plaintiff's attorney, Dr. Geiselman stated, "[the questions I answered] have more to do with the patient's preception (sic) of her limitations than with her true ability from a physical standpoint.  Pain is a subjective complaint which cannot be easily measured quantitatively.  If she [perceives] a great deal of pain, as she certainly does, this will lead to her inability to fully achieve what physically she should be capable of doing..." (TR. 238)(emphasis in original). He stated further on May 16, 1997, in a separate note, that the plaintiff "has had progressively more complaints and symptoms related to increased pain in her shoulders, back, legs and feet.  These complaints have caused her to function less than before because of increased pain.  From a physical examination

standpoint however there are no signs of increased neurologic or orthopedic abnormalities." (TR. 239).

Dr. Allen Greenstein, performed a clinical psychological disability evaluation of the plaintiff on July 15, 1999. (TR. 655-659). The plaintiff reported pain generalized throughout her entire body, headaches, earaches, trouble swallowing, and difficulty holding a pen or pencil.   She also complained of fatigue, memory and concentration problems, mood swings and loss of balance. The plaintiff told Dr. Greenstein that some activities which she was still able to engage in included feeding and caring for her dogs, watching TV, and reading.   She stated that with the help of her husband she would occasionally food shop, wash dishes and do the laundry.

Dr. Greenstein stated that the plaintiff was oriented to time, place, and person, able to perform arithmetic tasks satisfactorily, and "appeared to be more able to attend and concentrate during the current assessment than she reports during everyday life." (TR. 658).  Dr. Greenstein said that some of the psychological testing results may have been unreliable due to "the tendency of [the plaintiff] to have overstated her problems, to be overly self-critical, and to exaggerate the preponderance of symptomatology...It is clear that the nature of her symptoms and the excessive attention to her maladies limit her

range of activities, and restrict her level of functioning." (Id.) The diagnostic impression was major depression, recurrent, and fibromyalgia. (TR. 659).

An agency non-treating, non-examining physician performed a Residual Functional Capacity Assessment on November 6, 1995, which indicated that the plaintiff could occasionally lift up to 20 pounds, and frequently lift up to 10 pounds; that she could stand/walk/sit for about 6 hours in an 8-hour work day, and that she would be limited in reaching in all directions overhead. (TR.178-180).

The record contains a psychiatric review technique form completed by an agency non-treating, non-examining physician dated February 12, 1996, which indicates that the plaintiff had an adjustment disorder "due to pain" but that it did not result in restrictions of activities of daily living or episodes of deterioration or decompensation, and there were only slight difficulties in maintaining social functioning or deficiencies in concentration, persistence or pace.  There was no evidence of a Somatoform disorder. (TR. 185-191).

There is a subsequent Agency Psychiatric Residual Functional Capacity Assessment dated March 29, 2000.  It is unclear who authored the report. The reviewer considered the plaintiff's findings and complaints, pursuant to Section 12. 04 of the List of Impairments, which pertains to affective disorders.

The reviewer found that the plaintiff presented no evidence of a depressive, manic or bipolar syndrome, but that there was a diagnosis of depression.  This depression resulted in moderate restrictions of daily living, slight difficulties in maintaining social functions and that the plaintiff would often experience deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner.  It was noted that "never" had there been an episode of deterioration or decompensation in work or a work like setting. (TR. 356-358).

The plaintiff testified at the May 20, 1997 hearing that she had significant problems which included depression, difficulty walking up steps, pain in her hands when writing, vision problems, lack of concentration, irritability, fatigue, leg, neck , shoulder, and back pain.  She said she was able to do light cleaning such as run the vacuum cleaner, light laundry, light cooking, help with food shopping, and feed the dogs. She spends her day resting, lying down, watching TV, and reading a little.  She said that she may "putz around from one thing to another." (TR. 738).

At the July 16, 2002 hearing the plaintiff testified that she continued to have significant problems which included difficulty with swallowing, sleeping and concentration; that she had 2 herniated discs, headaches, fatigue, and

shoulder, ankle, low back, and leg pain.  She said she was able to do light laundry, help her husband food shop, and that she attempts to do crafts. (TR. 55-56).

The plaintiff reported that she quit going to physical therapy "a couple of years ago because he sold his practice." (TR. 57).  She also stated that additional physical therapy was recommended but that the therapist "said there was nothing he could do." (TR. 58).  She said that she had experienced depression, but started to take Celexa which "seemed to help." (TR. 59).

The plaintiff also stated that she has frequent bouts of diarrhea; that she has trouble walking up steps, cannot stand for long periods of time, and cannot walk more than one block, that her medications cause her to be drowsy, and that she has trouble manipulating things with her hands. (TR. 66-71).  The plaintiff's husband, David Kefauver, also testified at the hearing.  He stated that it seemed to him that the plaintiff's condition started as a result of the 1987 motor vehicle accident, and that the intensity of her pain keeps getting worse as time passes. (TR.75-76).

Dr. Cohen, the psychiatric medical expert, also testified at the hearing held on July 16, 2002.  He stated that he had reviewed the file and that he had concluded that the records indicated that the plaintiff's primary problem from

13

a psychiatric perspective was an untreated major depressive disorder. (TR. 37). He said that the plaintiff reported decreased energy, decreased appetite, and sleep problems. He stated that she was not psychotic, and that her condition was not organic.  He testified that it was important to understand that the depressive condition is reversible within several months with appropriate treatment.

Dr. Cohen noted that the plaintiff appeared to be able to care for her dogs, occasionally shop, do laundry and the dishes; that she visits with her mother, that her social functioning was only moderately impaired, and that this was due to her perceived physical limitations. (TR. 40).  He concluded that the records he reviewed indicated that her condition did not meet or equal any psychiatric condition in the applicable listings. (TR. 39).

Dr. James Ryan, a vocational expert, also testified.  He stated that the evidence he reviewed indicated that the plaintiff could perform rote, repetitious work, such as assembly or laundry work.  When asked by the ALJ to assume that the plaintiff would need to have unscheduled 2-hour work breaks in an 8-day, Dr. Ryan stated that the plaintiff would not be able to perform these jobs. (TR. 80-81).

## IV.    **DISCUSSION**

The plaintiff argues that the Commissioner committed six errors at the administrative level.  Specifically, the plaintiff avers that: (1) the plaintiff's due process and equal protection rights were violated by the nine year unreasonable delay in processing her claim; (2) both Administrative Law Judges erred in rejecting the opinions of the plaintiff's treating physician; (3) the ALJ erred in failing to properly consider the plaintiff's 1995 application and attendant medical records; (4) the ALJ failed to reference which medical records he relied upon in concluding that the plaintiff had the residual functional capacity to perform modified light level work; (5) the ALJ failed to assess the plaintiff's depression and it's effect on her residual functional capacity, and (6) the ALJ erred in failing to specify what testimony he found to be not credible. She maintains that the decision of the ALJ is not supported by substantial evidence, and that a more balanced review of the record must compel the conclusion that she was disabled from any kind of gainful activity as of December 31, 1988, the alleged onset date of disability.  She requests that this court reverse or remand this matter. (Doc. Nos. 1, 18).

The Commissioner responds that the sole issue is whether substantial evidence supports the ALJ's finding that, despite her impairments, the plaintiff

retained the residual functional capacity to perform modified light level employment, thus dictating a finding of "not disabled" as defined by the Act. (Doc. No. 24).

When reviewing the Commissioner's denial of disability benefits, this court is limited to determining whether the Commissioner's denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It is less than a preponderance of the evidence but more than a mere scintilla. Id. To receive disability benefits a claimant must demonstrate that she is unable " to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. A. 423 (d)(1)(A)(1991).

The plaintiff first argues that her due process and equal protection rights were violated because of "the incompetence, hostility and arrogance of the administrative law judges assigned to hear [the] case, and the fact that these particular administrative law judges treat persons with mental impairments as

if they were liars and malingerers when there is no basis for such treatment in either the facts or the law." (Doc. No., 1, ¶ 21(a)).

As a preliminary matter, the plaintiff has set forth no evidence whatsoever to substantiate her claim that the administrative law judges involved in this matter treat persons with mental impairments as if they were liars and malingerers.   In addition, it appears that most of the plaintiff's complaints concern the alleged bias and misconduct of the ALJ who rendered the first two decisions in this matter.  As the Commissioner correctly notes, the first two decisions in this matter were vacated. (TR. 363-364).   As a result, this court reviews only the final decision of November 6, 2002, although all evidence of record has been carefully considered.

As discussed in more detail below, the record contains substantial evidence to support the ALJ's conclusion that the plaintiff's combined physical and mental limitations are not so severe as to preclude her from performing a limited range of light level work. As a result, the decision should not be disturbed on appeal.

Regarding the claim that the ALJ erred in failing to assign controlling weight to the opinions of the treating physician's, the plaintiff argues:

> The ALJ failed to consider the fact that Dr. Greenstein and
> Dr. Geiselman agree as to the disabling nature of Ms. Kefauver's

17

> combined mental and physical impairments and that even the ME [Dr. Cohen] seemed to be in agreement. The ALJ at the third hearing simply accepted the ME's testimony that the mental impairment was untreated and would not be disabling if treated properly as if it were gospel and appears to have considered nothing else. Given the fact that Ms. Kefauver did follow recommended treatment and remained disabled this reliance on the ME is inappropriate.

(Doc. No. 18, p. 22).

The ALJ stated regarding the opinions of Dr. Geiselman:

> As for the medical opinions, the record contains assessments by Douglas Geiselman, M.D., indicating that the claimant was unable to perform an 8-hour workday (Exhibit 23). However, these assessments understate the claimant's abilities as supported by the examination findings and treatment history. Therefore, these opinions have been accorded little weight.

(TR. 24).

Under the "treating physician doctrine" greater weight must be given to the findings of a treating physician than to the findings of a physician or medical consultant who examined the claimant only once. Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time. Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). On the other hand,

a treating physician's statement that a claimant is disabled is not binding on the Commissioner.  Congress has determined that the Commissioner is solely responsible for deciding whether a claimant has met the Act's statutory definition of disability. 42 U.S.C. § 405(b); *See* 20 C.F.R. § 404.1527(e)(1).

Dr. Geiselman's notes cover the period July 31, 1989, through April 19, 2002. (TR. 215-245; 646-685).   The notes demonstrate that the plaintiff treated with Dr. Geiselman, on average,  approximately  every other month. They detail numerous complaints over the years, as noted above.  It is not necessary to recite each entry, however, it is clear that there are few clinical or diagnostic tests, or examination results, which explain the plaintiff's varied and diffuse complaints and symptoms. (TR. 237).  Dr. Geiselman believed that the plaintiff was capable of greater physical activity than she reported,  and that she was limited more so by her perception of her limitations, than by any verifiable physical limitations. (TR. 238).  He candidly noted on May 16, 1997:

> I do feel that the patient can lift less than 10 pounds frequently.  She does this in her daily household chores and routines...I am sure the patient stands, walks, and sits as part of her daily routine at home; therefore, if given the opportunity to take frequent positional changes and perhaps lie down occasionally she should be able to do those items checked...She should be able to do those items I have listed from a physically functional standpoint, but may not be able to achieve them due to her pain level which limits her...I hope this will clarify your apparent confusion about what may appear to be contradictory

statements, but which I feel in fact are not because of the overlapping nature of the physical and psychological components.

(TR. 238).

Dr. Geiselman filled out at least three Statements of Claimant's Ability To Perform Work-Related Physical Activity assessment forms over the course of his treatment.   Dr. Geiselman opined that, although the plaintiff demonstrated some limitations, she was capable of occasionally lifting up to 20 pounds, frequently lifting up to 10 pounds, and that she could stand or walk from 2-4 hours in an 8-hour day, and could sit, with normal breaks, for 6 or more hours in an 8-hour day.(TR. 216-218; 223-230, 243-245).

In reviewing Dr. Geiselman's notes one is struck by the paucity of objective findings, and the lack of any significant treatment other than bi-monthly check-ups, subsequent to 1997.  The notes are largely a recitation of the plaintiff's complaints.  They offer little insight into Dr. Geiselman's actual treatment of the plaintiff, if there was any, other than casual references to medication changes. In early 1996, Dr. Geiselman referred the plaintiff for several diagnostic tests, none of which had abnormal results.  Subsequent to 1996, however, there have been notably few referrals.   If the plaintiff's impairments were as severe as she maintains, one would expect to find additional referrals for consultative examinations, additional physical and/or

psychiatric therapy, or laboratory testing.  And even if Dr. Geiselman were not inclined to seek additional professional input, given the alleged persistence and severity of the plaintiff's impairments and limitations, one would reasonably expect that she herself would have sought out additional help.

In contrast to Dr. Geiselman's opinion regarding the plaintiff's alleged inability to perform any type of work, other physicians who examined the plaintiff did not find her to be significantly impaired.  On April 18, 2000, Dr. Catino stated that the plaintiff was "in no acute distress," and found few clinical signs to explain her complaints.  He recommended that an MRI be obtained.  The test results dated April 20, 2000, revealed a right lateral disc herniation at L5/S1 impinging on the right S1 nerve root. (TR. 676).  Despite this finding, there are no further records from Dr. Catino in the file. Dr. Geiselman's notes subsequent to the date of the MRI, however, indicate that on numerous occasions he told the plaintiff that he wanted to refer her to a Dr. McAfee, but that she refused. (TR. 682).

In addition, Dr. Naidu noted that the plaintiff was "getting better with regards to this vague left upper extremity pain."  He stated that there were no focal findings to explain her complaints. (TR. 273-274).

As noted above, Dr. Cohen testified at the hearing held on July 16,

21

2002.  He stated that the plaintiff's primary psychiatric problem was an untreated major depressive disorder, and that it is possible for such a condition to be reversed in several months with proper treatment. As noted above, in order to receive disability benefits a claimant must demonstrate that she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Thus, the ALJ apparently concluded that any impairment associated with the plaintiff's major depression, if treated, would not last for a continuous period of 12 months.

The plaintiff argues that she received adequate treatment from her family physician who, she maintains, talks with her and has prescribed various anti-depressants. She did, however, write in December 1999, regarding her treatment by Dr. Geiselman, "he doesn't say much anymore, just checks me over and writes prescription." (sic) (TR. 494).  Dr. Cohen expressed concern that the specific anti-depressants prescribed for the plaintiff were incompatible and stated that they were rarely prescribed in tandem.

In addition, Dr. Greenstein's evaluation suggested that the plaintiff "appeared to be more able to attend and concentrate during the ...assessment

than she reports during everyday life," and that she appeared to be "somewhat self-serving." [1] (TR. 704-705). Furthermore, it is notable that no health professional has diagnosed a somatoform disorder. Therefore, there is substantial evidence to support the ALJ's decision to ascribe limited weight to the opinions of Dr. Geiselman.

The plaintiff also complains that the ALJ failed to specify which evidence he relied upon in concluding that the plaintiff had the residual functional capacity to perform modified light level work.  The ALJ, however, stated that he relied upon records such as "progress notes [which] show that the claimant reported improvement with medication, and that she did not require significant ongoing treatment for her symptoms." He specifically referenced hearing Exhibit B-3F, which are Dr. Geiselman's treatment notes. Therefore, the plaintiff's complaint in this regard is not supported by the record.

The plaintiff next claims that the ALJ failed to address the plaintiff's depression and it's effect upon her residual functional capacity.  This also is not the case.  The ALJ devoted an entire paragraph of the decision to the

---

[1] The plaintiff also implied that Dr. Greenstein was also of the opinion that she is completely disabled as a result of her emotional response to her pain.  A fair reading of Dr. Greenstein's report, however, suggests that he was not entirely convinced of the plaintiff's credibility as to the severity of her stated limitations.

plaintiff's psychiatric complaints and the records in this regard. He referenced a July 1999 evaluation, and Dr. Cohen's testimony, both of which supported the ALJ's finding that the plaintiff's depression was not so severe as to prevent her from performing modified light level work activity.

Finally, the plaintiff complains that the ALJ erred in failing to specify what testimony he found to be not credible.  On the basis of the record as a whole the ALJ concluded that the plaintiff was not credible regarding the severity of her symptoms and related mental and physical limitations. Credibility determinations as to a claimant's testimony regarding her limitations are for the ALJ to make. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the Administrative Law Judge's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984).  Where an ALJ's credibility determinations are supported by substantial evidence, they will not be disturbed on appeal. Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).

The Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. § 404.1529. First, symptoms such as pain, shortness of breath, fatigue, *et cetera*, will only

be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. § 404.1529(b).  Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. 20 C.F.R. §404.1529(b).  In so doing, the medical evidence of record is considered along with the claimant's statements. 20 C.F.R. § 404.1529(b).  Social Security Ruling 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding his or her symptoms:

> [I]n general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.

Applying these standards, the ALJ stated that he found the plaintiff to be

not entirely credible because the medical records indicated that she reported improvement with medications, and also because the medical records did not show any ongoing treatment of any significant nature. He referenced Dr. Greenstein's report which stated that the plaintiff tended to overstate her problems and exaggerate her symptomatology. (TR. 23).  Thus, the ALJ did not err in failing to specify what evidence he relied upon in making his credibility determinations.

This court reviews the ALJ's credibility determinations to determine whether they are supported by substantial evidence.  As noted by the ALJ, at least one evaluator believed that the plaintiff's stated problems were self-serving and exaggerated. The record also indicates that on several occasions the plaintiff prepared statements as to her previous job requirements, her perceived impairments and limitations, and a recitation of what she described as "a typical day." (*See, e.g.* TR.  135-154; 216-218; 246-259; 456-478; 486-489).  These documents are exhaustive, detailed and comprehensive, and belie the plaintiff's statements that she lacks concentration, or, for example, that she cannot hold a pen or type.

There are also other discrepancies in the record.  The plaintiff was treated for a left arm injury in April 1996, at a time when she claims she was

incapable of performing any type of work whatsoever. On August 23, 1996, Dr. Daniel E. Gelb wrote in a report that the plaintiff "fell onto her outstretched arm in April from her deck." (TR. 282). However, Dr. Naidu stated on November 26, 1996, that the plaintiff told him that she injured her left forearm "after a specific fall in...April on the sidewalk in an Atlantic City trade show." (TR. 272). Such inconsistencies in the record justify the ALJ's conclusion that the plaintiff was not fully credible. As a result, the ALJ's findings in this regard should not be disturbed on appeal.

We note parenthetically that the plaintiff attempts to prove her disability by repeated asserting the fact of her fibromyalgia diagnosis. A particular diagnosis by a treating doctor does not automatically entitle a claimant to social security disability benefits. Whatever the diagnosis, the claimant must still provide sufficient evidence that she has met the Act's statutory definition of disability. *See e.g.,* Estok v. Apfel, 152 F.3d 636 (7th Cir. 1998)(physician's diagnosis, relating back to period claimant was insured, is not enough to show disability; claimant still has the burden to provide sufficient evidence of disability under the terms of the Social Security Act). There is no question that the plaintiff has a diagnosis of fibromyalgia. Furthermore, the ALJ did not reject this diagnosis. Rather, he concluded that the fibromyalgia, although

severe, was not so severe as to preclude the plaintiff from performing a modified range of light level work.

In addition, the plaintiff claims that the ALJ erred in failing to address the plaintiff's initial application for benefits which was filed on August 31, 1995. While it is true that the ALJ stated that it was the August 1, 1997, application which was under review, it is nevertheless obvious that the ALJ reviewed medical records dating as far back as 1989. Whether the ALJ considered only the 1997 application, or both applications, the result would have been the same. Thus, to the extent that the ALJ failed to specifically address the August 31, 1995 application, the error is deemed to be harmless.

In summary, there is substantial evidence in the record to support the ALJ's conclusion that the plaintiff retained the residual functional capacity to perform a modified range of light level work, and that the plaintiff is not entitled to disability benefits for any period between December 31, 1988, the alleged onset date of disability through November 6, 2002, the date of the decision under review.

## V.  <u>RECOMMENDATION</u>

On the basis of the foregoing, **IT IS RECOMMENDED** that the

plaintiff's appeal be denied.

<u>s/ Malachy E. Mannion</u>
MALACHY E. MANNION
United States Magistrate Judge

Date:   April 19, 2005
O:\shared\REPORTS\04-1187.wpd